## Case No. 373.

### ANDREWS v. DOLE et al.

[11 N. B. R. (1875,) 352.]

District Court, D. New Jersey.

BANKRUPTCY—FRAUDULENT CONVEYANCES—STATUTE OF LIMITATIONS—LACHES.

[A debtor executed a fraudulent conveyance of his real estate in 1865, and in 1867 passed into bankruptcy. On June 12, 1874, the assignee filed a bill attacking the conveyance, alleging that the grantor had retained possession of the property after the conveyance, and received the rents and profits thereof, and containing no averments showing that plaintiff had taken steps or made inquiries to ascertain the bona fides of the conveyance, but merely averring that he was ignorant of the fraud until informed of the facts June 14, 1872. Defendants pleaded the limitation of two years prescribed by Act March 2, 1867, § 2. Held, whether the statute began to run from the date of the appointment of the assignee or from the discovery of the fraud. it was a bar in this case, for want of due diligence in discovering the fraud.]

[In bankruptcy. Bill by Isaac M. Andrews, assignee in bankruptcy of Nathaniel Dole, against said Nathaniel Dole and others, to set aside, as fraudulent, transfers of his property made by said bankrupt. Delos E. Culver, made defendant as trustee, demurred to the bill. Demurrer sustained.]

G. W. Lockwood, Jr., for plaintiff.

R. Gilchrist and F. N. Bangs, for defendants.

NIXON, District Judge. This is a bill filed by an assignee in bankruptcy to recover certain real estate and personal property, alleged to have been transferred by the bankrupt in fraud of his creditors. The bill charges that the defendant, Nathaniel Dole, was adjudicated a bankrupt June 27, 1867, in the southern district of the state of New York; that the complainant was appointed assignee October 12, 1867, and that an assignment was duly made to him of all the estate and effects of the bankrupt, pursuant to the 14th section of the act; that Dole was engaged in business as a banker and broker in the city of New York in November, 1863, under the name and firm of Dole & Company, and continued in said business until March 14, 1864, when the firm failed and became insolvent, having liabilities to the amount of about five hundred thousand dollars; that at the time of said failure Dole was the owner of large tracts of real estate in Jersey City, New Jersey, and also the owner of 18,640 shares of the capital stock of the defendant, the Weehawken Ferry Company, of the par value of fifty dollars per share (the capital stock of the company being 20,000 shares), and also the owner of an indebtedness due to him from the said company, for moneys advanced, of about one hundred and forty-eight thousand dollars; that, shortly after the failure of Dole & Co., the said Dole conspired with one of the defendants, Jules S. De La Croix, to cheat and defraud his individual creditors, and the creditors of the said firm, by putting the title of his property in the name of the said De La Croix; that, in pursuance of this fraudulent design, he executed transfers of property as follows: (1) A deed from Dole and wife to the said De La Croix, dated March 30, 1864, for 18 52-100 acres of land, and duly recorded in the clerk's office of the county of Hudson, in Book 109 of Deeds, fol. 239; (2) one other deed, of the same date, for 71 87-100 acres, and recorded as aforesaid in Book 109 of Deeds, fol. 252; (3) one other deed, dated April 6, 1864, for 77½ acres, and recorded as aforesaid, in Book 107 of Deeds, fol. 557. That on the 31st of December, 1864, with the like fraudulent intent, he transferred to said De La Croix 18,640 shares of the capital stock of the Weehawken Ferry Co., and also his claim of indebtedness for one hundred and forty-eight thousand dollars against the said company; that the only consideration received by Dole for the said property was the promissory notes of De La Croix, amounting in the aggregate to fifty-two thousand dollars; that said De La Croix was the brother-in-law of Dole, residing in Newburyport, Massachusetts; that he was, and is, wholly irresponsible and without pecuniary means, and dependent upon said Dole for his support.

The bill further alleges, that on the 11th of August, 1865, Dole and his wife executed a new conveyance of the same real estate to the said De La Croix for the pretended consideration of two hundred and fourteen thousand dollars, in which the said land was more particularly described by metes and bounds, which last-mentioned deed was recorded as aforesaid in Book 122 of Deeds, fol. 627; that no consideration was ever paid for the said property by the said De La Croix, or for any part thereof; that Dole did not part with the possession, nor deliver the same or any part thereof to De La Croix; but, on the contrary, resided on the property during the years 1864 and 1865, and has held, possessed, controlled, managed, and enjoyed the same and the proceeds thereof; collecting the rents and profits thereof the same since pretended sales as before, and has appropriated the said rents and profits to his own benefit.

The bill further alleges, that about June 1, 1865, Dole purchased of one Waterbury, Reynolds & Downing, a large tract of land in Hudson county, for forty-five thousand dollars, and procured the title of the same to be made to the said De La Croix; that afterwards, to wit, about April 3, 1866, he sold one portion thereof to the Pennsylvania Coal Co., and another part to Henry G. Schmidt, at a profit of about fifty thousand dollars—the transaction being negotiated by the said Dole for his own benefit, in the name of the said De La Croix; and that of the property, transferred as aforesaid by Dole and wife to De La Croix, Dole has subsequently sold for his own use, in the name of De La Croix, several parcels, by deeds, as follows: (1) one to W. Niles, dated January 24, 1867, conveying a lot 200 by 350 feet for three thousand dollars; (2) one to Weehawken Ferry Co., dated November 9, 1867, for 15 82-100 acres for the expressed consideration of one hundred dollars; (3) one to F. H. Cassatt, dated March 2, 1868, for 18 52-100 acres for eighteen thousand dollars; (4) one to John L. Jones, dated June 17, 1868, for six acres for fifty thousand dollars; (5) one to Jay Gould, dated September 1, 1868, for 77½ acres for three hundred and fifty thousand dollars; (6) one other to the Weehawken Ferry Co., dated December 31, 1870, for 31 11-100 acres for two hundred thousand dollars; (7) another of the same date to same company for several lots of land for seventy-five thousand dollars; (8) another of the same date to the same company for 21 81-100 acres for

seventy-five thousand dollars, and (9) another to same of like date for fifty thousand dollars. That the said Dole is now, and has been since long prior to March 1, 1864, the president of the Weehawken Ferry Co.; that during the month of December, 1870, he caused to be executed by said De La Croix and himself, as president of said Ferry Co., various conveyances and releases of land, and had transferred to the New Jersey Midland Railway Co., large portions of the said real estate held by De La Croix as aforesaid, for the bonds of the said Railway Co., of the par value of six hundred thousand dollars, and for the further consideration, that the company should assume and pay a certain indenture of mortgage, executed by the said Ferry Co. to one Francis Price, to secure the payment of one hundred and seventy-five thousand dollars; that Dole caused to be executed for his own use and benefit, but in the name of De La Croix, various mortgages upon the real estate held by De La Croix as aforesaid; sometimes to aid him in his purchases of other property, and sometimes to secure debts contracted by said Dole prior to 1864; that on January 2, 1867, De La Croix gave a mortgage to one Hugh White on a parcel of the said real estate to secure the payment of thirty-six thousand one hundred and sixty dollars, said White being a creditor of Dole in 1864, and the mortgage being given to secure said debt, and to procure the dismissal of a bill filed by White to set aside the above recited pretended conveyances to De La Croix; that the said mortgage was afterward paid by Dole in September, 1868; that De La Croix executed mortgages upon the said property at the instance and suggestion of said Dole, as follows: (1) one to Chas. G. Waterbury and others, dated June 1, 1865, to secure eighteen thousand nine hundred and fifty-three dollars, and paid by Dole, July 6, 1868; (2) one Elizabeth Paterson, dated December 2, 1868, for four thousand eight hundred dollars; (3) one to Jeremiah Lathrop, trustee, September 1, 1866, to secure twenty-nine thousand eight hundred dollars, for the alleged use and benefit of several of the relatives of the said Dole; (4) one to Charles G. Sesson, November 12, 1864, for thirty-five thousand dollars; (5) one to John B. Niles, November 6, 1870, for six thousand dollars; (6) one to the Union Ferry Co., October 1, 1870, for twenty thousand dollars; and that on the 31st of December, 1870 (being the day of the above recited transfer of real estate by Dole, in the name of De La Croix, to the Weehawken Ferry Co., amounting in the aggregate to four hundred thousand dollars), the said Ferry Co., by its president, Dole, executed a mortgage upon the real estate so conveyed to the defendant, Delos E. Culver, as trustee, to secure the payment of seven hundred bonds of said Ferry Co., of the par value of one thousand dollars each, making the aggregate

of seven hundred thousand dollars, the transaction being a part of the fraudulent scheme of said Dole and De La Croix to cover up said property, and to secrete it from the creditors of Dole, and the said bonds being the consideration for the real estate transferred to said company by De La Croix as aforesaid, and for the debt of one hundred and forty-eight thousand dollars which the company owed to Dole in 1864.

The bill further charges that the capital stock of the Weehawken Ferry Co. was divided into 20,000 shares, of the par value of fifty dollars per share; that Dole, at the time of his failure in 1864, owned nearly all of said said capital stock, to wit, 18,640 shares, which he then reported to be worthless, and transferred, without consideration, to De La Croix; that on the real estate conveyed as aforesaid by De La Croix were a number of dwelling-houses and extensive stone quarries, from which said Dole has since derived a large amount of money, and appropriated the same to his own benefit, using the name of De La Croix and of the Weehawken Ferry Co., of which he was president and chiefly owner, to conceal and cover up his interest in said property, and the profits derived from the rents and quarries aforesaid.

The complainant then avers "that he had no knowledge, information, belief, or suspicion of the fraudulent acts herein complained of, nor of any of them, nor of any of the acts, matters, and things relating in any manner to said property and the said transfers thereof until on and after the 14th day of June, 1872, when all the said fraudulent acts and deeds were communicated to him by one G. W. Lockwood, Jr., of the city of New York." After alleging that all of the property, real and personal, conveyed by Dole to De La Croix in March, April, and December, 1864, and August, 1865, or so much thereof as was retained by De La Croix when the petition in bankruptcy was filed on the 25th day of June, 1867, was held in secret trust for the use and benefit of Dole, the complainant charges that the said property, and all the rents, issues, and profits vested in him as the assignee of Dole, by virtue of the assignment, and that he is entitled to the same and to the proceeds of the sale thereof, in the hands of Dole, De La Croix, the Weehawken Ferry Co., and Delos E. Culver, trustee, or either of them.

The prayer of the bill is, that all the transfers of property, real and personal, made by the bankrupt, Dole, to De La Croix, as aforesaid, and by the said De La Croix to the Weehawken Ferry Co., may be decreed fraudulent and void; that the several defendants may be required to account for the proceeds realized by them, or either of them, from any sale or other disposition of said property, and to assign all bonds, mortgages, stock, notes, or other securities held by them and resulting from said sales, that an injunction may issue restraining the defendants,

or any of them, from pledging, selling, encumbering, or interfering with the said property in fraud of the rights of said assignee and creditors of the said bankrupt, and for the appointment of a receiver.

To this bill the defendant, Delos E. Culver, having been served with process, appeared by counsel and demurred, and assigned several causes of demurrer. From the view taken by the court of the case, it will be necessary to examine only one of these, to wit, the third: That by the second section of the act entitled "An act to establish a uniform system of bankruptcy throughout the United States," approved March, 2, 1867, it is among other things in substance enacted, that no suit shall in any case be maintainable, at law or in equity, in any court whatsoever, by any assignee in bankruptcy, touching the property and rights of property of the bankrupt, transferable to or vested in such assignee, unless such suit shall be brought within two years from the time the cause of action accrued for such assignee, and it appears on the face of the record in this suit that such suit was brought after the expiration of two years from the time the cause of action accrued for such assignee.

We are thus called upon to construe the last clause of the second section of the bankrupt act, relating to the time in which suits may be brought by assignees, in regard to the property and rights of property of the bankrupt. That section, after conferring upon the circuit courts concurrent jurisdiction with the district courts of all suits at law or in equity, which may be brought by the assignee in bankruptcy against any person claiming an adverse interest, or by any such person against the assignee, touching any property or rights of property of the bankrupt, transferable to or vested in such assignee, then enacts, "But no suit at law or in equity shall in any case be maintainable by or against such assignee, or by or against any person claiming an adverse interest, touching the property and rights of property aforesaid, in any court whatsoever, unless the same shall be brought within two years from the time the cause of action accrued for or against such assignee, provided that nothing herein contained shall revive a right of action barred at the time such assignee is appointed." I am not aware that this clause has yet received judicial construction, although it has attracted the attention of several judges in a number of cases, as for instance of Judge Dillon in Martin v. Smith, [Case No. 9,164;] of Judge Treat, in Davis v. Anderson, [Id. 3,623;] of Judge Sharswood, in the supreme court of Pennsylvania, in Peiper v. Harmer, 5 N. B. R. 252; of Judge Blatchford, in Re Dole, [Case No. 3,965;] and of Judge Hill, in Friedlander v. Holleman, [Id. 5,081.]

This suit is brought by the assignee under the 14th section of the act, to recover property "conveyed by the bankrupt in fraud of the creditors;" and, by the provisions of that section, all such property is at once vested in the assignee by virtue of the adjudication of bankruptcy and the deed of assignment. It is insisted by the counsel of the defendant that the cause of action accrued to the assignee contemporaneously with the acquisition of the title to the property in controversy, and that as it appears by the bill that such title vested on the 12th of October, 1867, the action should have been commenced within two years from that date. The counsel for the complainant, on the other hand, maintains that as he comes into a court of equity for relief on the ground of fraud, and alleges a fraudulent concealment of the cause of action by the defendant, he is entitled to apply to the case the long established equity rule, that statutes of limitation do not begin to run until the fraud has been, or by reasonable diligence may have been, discovered. We have, then, the question fairly presented, whether such equity rule is to be invoked in those cases where the statute in express terms is made to apply to courts of equity as well as to courts of law, and where no exceptions to the limitation have been incorporated into the act itself?

It is a question upon which the best judicial minds of England and the United States have differed, and in view of the state of the law, is full of difficulty in all of its aspects. In examining it, let it be observed that statutes of limitations have never been understood to apply to courts of equity, in respect to causes of equitable cognizance, for the reason, as was observed by Lord Macclesfield in the Hollingsworth Case, 1 P. Wms., 744, that "they speak nothing of bills in equity." Yet, those courts have always held that wherever the legislature has limited a period for law proceedings, equity will, in analogous cases, consider itself bound by the limitation. Suits for relief, on the ground of fraud, have always been regarded, however, as exceptions to this extent, that equity will not allow the statute of limitations to operate until discovery of the fraud, or the means afforded of the discovery; holding, that pending its concealment by one party there was no laches in regard to the other, or, in other words, that it would be unconscionable for courts of equity, that are only bound by the spirit of the statute, to permit the defendant by pleading it, in cases of fraudulent concealment, to take advantage of his own fraud.

Attempts were early made to engraft this exception upon the statute of limitations in its application to its actions at law, and to the plea of the statute in bar to allow a replication, that there had been a fraudulent concealment of the cause of action by the defendant, and that suits had been commenced within, etc., the date of the discovery of the fraud. Thus, the supreme court of Massachusetts, in [First Massachusetts]

Turnpike Corp. v. Field, [3 Mass. 201,] held, in a suit at law, that a replication to a plea of the statute of limitations was good which disclosed a fraudulent concealment of the breach of the contract. Ch. J. Parsons, in delivering the opinion of the court, said, that where the delay in bringing the suit was owing to the fraud of the defendant, the cause of action against him ought not to be considered as having accrued until the plaintiff obtained the knowledge that he had a cause of action; and that if this knowledge was concealed from him by defendant fraudulently, the court would violate a sound principle of law if they permitted the defendant to avail himself of his own fraud. And that eminent judge, Mr. Justice Story, in Sherwood v. Sutton, [Case No. 12,782,] in an action on the case for a deceitful representation in a sale, to which the statute of limitations was pleaded in bar, sustained the replication of the plaintiff, that there had been a fraudulent concealment of the deceit by the defendant, until within six years before the suit was commenced. His opinion in the case exhibits, of course, much learning and research, but he is careful to state at the outset: "As a consideration of no inconsiderable weight, that as there was no state court in the judicial establishment of New Hampshire (the district in which the action was pending) which possessed general equity powers, the remedy (i. e., the suspension of the statute until the discovery of the fraud,) if it was to be administered at all, must be administered in such cases through the instrumentality of the courts of law." He further conceded that, as the statute of limitations in New Hampshire was in substance a transcript of the statute of 21 Jac. 1, so far as it respected personal actions of that nature, and as it contained like exceptions in favor of infants, feme-coverts, etc., but none as to actions founded in fraud, where the fraud had been concealed during the period of limitation, the legal propriety of creating such an exception would depend upon the same principles here as it would in the courts of Westminister Hall. He then examined how such a plea had been treated at law in the English courts, and came to the conclusion that there was enough in the dicta of several judges, commencing with Lord Mansfield, in Bree v. Holbech, 2 Doug. 655, to warrant the inference, that the law courts of that country would not hesitate to postpone the operation of the statute in case of the fraudulent concealment of the cause of action.

To the same effect was the intimation of Mr. Justice Curtis, in Prichard v. Chandler, [Case No. 11,436,] which was a case under the somewhat analogous statute of limitations in the bankrupt act of 1841, where it was in substance held, that if the bankrupt fraudulently concealed from the assignee the cause of action from the time when his title accrued, the two years' limitation did not begin to run.

But their attempts at judicial legislation were resisted in other states, and made little progress. The supreme court of Vermont, in Smith v. Bishop, 9 Vt. 110; of New York, in Troup v. Smith's Ex'rs, 20 Johns. 33; of Ohio, in Fee v. Fee, 10 Ohio, 469; and the court of appeals of Virginia, in Callis v. Waddy, 2 Munf. 511,—have all held, that at law, independent of any express provision, the statute of limitations begins to run from the time the cause of action first accrued, even where the defendant has fraudulently concealed it from the plaintiff.

The question came before the English court of exchequer in 1854, in the case of Imperial Gas Light & Coke Co. v. London Gas Light Co., 26 Eng. Law & Eq. 425, and the court held that to a plea of the statute of limitations, that the cause of action did not accrue in six years, it was no answer, that in consequence of the fraud of the defendant the plaintiff was prevented from discovering the cause before that time, and that he commenced his action within six years after he discovered it. The court assumed during the argument that the question was no longer open, and that the principle had been established by many cases, that the statute runs from the accruing and not from the discovery of the cause of action. C. B. Pollock, in delivering the opinion of the court, struck the keynote of the difficulty in allowing such a replication in proceedings at law, by observing: "The statute of limitations expressly points out certain cases in which it is not to run, that is, the cases of persons under certain species of incapacity, but it does not make any exception in favor of persons laboring under any other incapacity, and we cannot graft upon the statute the exception here sought to be engrafted on it, namely, where, by the fraud of the defendant, the plaintiff has been prevented from asserting his rights within the time prescribed by the statute." * * * "If we were to hold the legislature as having enacted, that the statute of limitations should not run, whenever the jury are satisfied that a fraud has been practiced to prevent its operation, it would not only give rise to much litigation, but to that which the law abhors—continual litigation: 'Interest reipublicae ut sit finis litium.'"

The statute of limitations has been called the statute of peace, but if the construction here contended for by the plaintiffs were to prevail whenever there was a case of hardship or suggestion of fraud, you would have an action brought, though the statute had expired, and have it urged that the matter was for the jury and not for the court. To which suggestion Alderson, B., added: "There would be no statute of limitations against a widow with six children." And such is obviously the opinion of the supreme court of the United States, so far as it can be gathered from the general principles announced in the cases where it has had the statute of limitations under consideration. Thus, in

McIver v. Ragan, 2 Wheat. [15 U. S.] 25, an attempt was made to incorporate into the statute an exception which the legislature had not expressed. The case was briefly this: An ejectment was brought for a large tract of land in North Carolina. The defendant claimed under a junior patent and an adverse possession of seven years, which, by the statute of limitations of the state, was a bar if the possession was under color of title. The plaintiff offered to show that no course or corner of the grant under which he claimed was marked; that the land in dispute was within the Cherokee Indian boundary, and was not ceded to the United States until 1806; that the action was commenced within seven years of that date, and that while the land was a part of the Indian Territory he was prohibited by the laws of the United States from entering thereon for surveying or marking the same. Ch. J. Marshall delivered the opinion of the court, and upon the claim that the statute ought not to be allowed to run while the disability existed in regard to surveying and marking the land, observed: "Whenever the situation of a party was such as in the opinion of the legislature to furnish a motive for excepting him from the operation of the law, the legislature has made the exception. It would be going far for this court to add to those exceptions. * * * If this difficulty be produced by the legislative power, the same power might provide a remedy; but courts cannot on that account insert in the statute of limitations an exception which the statute does not contain." The above case was referred to and quoted with approbation, by the same court in 1850, in Bank of State of Alabama v. Dalton, 9 How. [50 U. S.] 529. Mr. Justice Catron, speaking for the whole court, observing: "The legislature having made no exception, the courts of justice can make none, as this would be legislating. * * * The rule is established beyond controversy."

The object of this review has been to indicate, first, that courts of equity, although they were not embraced within the statute of limitations, act in obedience to it, in cases where their jurisdiction is concurrent with courts of law; second, that they act by way of analogy only, where they apply it to equitable rights and titles not cognizable at law; and third, that they decline to recognize its obligations in cases of direct trust and secret fraud, not because they are above the law, but outside of it, and because the statute, not being addressed to or obligatory upon them, ought not to be applied in the exercise of an equitable discretion for the encouragement or protection of fraud. But if no discretion has been left to them by the legislature—if the statute has been prescribed for all courts, and in all suits in equity and at law—where is the authority in equity, any more than at law, to incorporate within it an exception which the

congress, in its desire to afford facilities for the speedy settlement of bankrupt estates, did not see proper to put in? And if any hardship should result, in particular cases, because of such omission, is not the remedy to be found in the legislature rather than in the courts?

Although my attention has not been directed to any judicial construction of the clause in question, there are several cases in which learned judges have incidentally suggested, that where the statute of limitations has in express terms been made applicable to all courts, no court ought to add an exception which the legislature has not expressed. Thus in U. S. v. Malliard, [Case No. 15,709,] a suit was brought by the government to recover the value of certain merchandise, on the ground that such value became forfeited by reason of the violation of the 66th section of the act of March 2, 1799. The defendants pleaded that the cause of action did not accrue within five years next before the bringing of the suit. To this the plaintiffs replied, that the acts set forth in that respect in the declaration, were fraudulently concealed by the defendants from the plaintiffs, until within five years before the suit, so that they could not until within that period elect whether to claim for forfeiture of the goods or of their value, or bring an action for such acts. To this replication the defendants demurred, and Judge Blatchford sustained the demurred, saying, "It is well settled, that however strong the reason may be, a court cannot engraft on a statute of limitations an exception which the statute itself does not make * * * so, also, the clear weight of authority, at least in the state of New York, is, that where the statute does not make a fraudulent concealment of the existence of the cause of action an exception to the running of the statute, the court has no right or power to make such exception, either directly, or by the indirect method of saying that the cause of action does not accrue in case of a fraudulent concealment, until the discovery of the fraud. It is true that Mr. Justice Story, in Sherwood v. Sutton, [Case No. 12,782,] dissents from the decision in 20 Johns., (Troup v. Smith's Ex'rs); but I cannot but regard the making by the court of an exception, in a case of fraudulent concealment, when the statute does not make it, as violating the rule settled by the supreme court, as before stated."

Freelander v. Holleman, [Case No. 5,081,] was a suit brought by creditors of a bankrupt, making the assignee a party-defendant to set aside certain conveyances of the bankrupt as fraudulent and void. The court treated the case as if the assignee was a co-complainant, in order to consider the question presented, to wit: whether the limitation to bringing such suit in the second section of the bankrupt act, should be applied to the case. Judge Hill dismissed the bill, because it was not filed within two

years after the title of the property in dispute had vested in the assignee by the deed of assignment, saying, "This act, unlike the state statute, makes no exception in favor of married women, infants, absence, or for concealment of the cause of action; and thus congress, having complete power over the whole subject, had the right to provide, and such provision is in accordance with the policy of the law, and is a rule which it is the duty of this and all other courts to apply when a case is presented to which it is applicable."

Martin v. Smith, [Case No. 9,164,] was an appeal from the district court to the circuit court of the United States, in Missouri, in a suit where a bill had been filed by an assignee in bankruptcy to recover property alleged to belong to the bankrupt estate. The case was made to turn upon the statute of the state of Missouri, which provides that "actions for relief on the ground of fraud must be brought within five years after the cause of action accrued; but the cause of action shall be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." It became necessary for Judge Dillon to construe this clause, and in doing so he observed: "If the provision had been merely that, 'actions for relief on the ground of fraud should be commenced within five years after the cause of action accrued,' it is extremely probable that the courts would have been obliged to have held that the statute would begin to run from the period when the fraud was consummated; and not as, under the well-known equity rule, from the period when the fraud was or should have been discovered. To remove all doubt on the point, and to preserve the equity doctrine on the subject, the legislature added the words: 'The cause of action in such case shall not be deemed to have accrued until the discovery * * * of the facts constituting the fraud.'"

If congress had been desirous of preserving the equity doctrine on this subject, in the bankrupt act, would not some such clause have been equally necessary?

But whilst I am strongly inclined to hold that the demurrer must be sustained on this ground, it is not necessary so to do. There is another ground on which, in my judgment, the demurrer is fatal to the bill as filed. It must be remembered that where courts of equity postpone the operation of the statute of limitations in cases of concealed fraud, the postponement is not until the discovery of the fraud, but until the period of time when, with due diligence, he might have discovered it.

The bill discloses these facts: The assignee was appointed in 1867. All the property and the rights of property of the bankrupt, including all that he had conveyed in fraud of his creditors, then vested in the assignee. It was his duty at once to devote his time to the collecting in the assets of the estate, in order to their distribution amongst the creditors. His attention was not to be confined to the property included in the schedules, but it was especially his duty to ascertain by what tenure this voluntary bankrupt retained the possession of a large amount of valuable real estate which he had not put in the schedules, or surrendered to the assignee. The bill alleges that the bankrupt reported no assets, but stated debts amounting to upwards of six hundred and fifty thousand dollars. It also alleges that he was then in the possession of property worth hundreds of thousands of dollars. After the recital of the conveyance by the bankrupt and wife to De La Croix, on August 11, 1865, of the real estate in controversy for the pretended consideration of two hundred and fourteen thousand dollars, it then avers "that no consideration was ever paid for said property by De La Croix, or for any part thereof; that Dole did not part with the possession, nor deliver the same or any part thereof, to De La Croix, but, on the contrary, resided on the property during the years 1864 and 1865, and has held, possessed, controlled, managed, and enjoyed the same and the proceeds thereof, collecting the rents and profits the same since said pretended sale as before, and has appropriated the said rents and profits, and the proceeds thereof, to his own use and benefit." Now, surely such a state of affairs should have put the assignee and creditors on inquiry. They had the whole effective machinery of the bankrupt law within their reach, to investigate, and sound to the bottom, every business transaction in which the bankrupt had been engaged for years before the adjudication. Was anything done or attempted by the assignee or the creditors until the filing of the present bill, June 12, 1874, nearly seven years after the cause of action had accrued to the assignee? If there was, he has not thought proper to disclose it in the bill. His only allegation on the subject is, that "he had no knowledge, information, belief, or suspicion of the fraudulent acts herein complained of, nor of any of them, nor of any of the acts, matters, and things relating to any of said property and the transfers thereof, until on and after June 14, 1872, when they were communicated to complainant by G. W. Lockwood, Jr., of the city of York."

But mere absence of knowledge is not a sufficient excuse for the delay, when the facts exist, which are notorious and which suggest inquiry to the assignee. Was any inquiry made? If so, it ought to have been stated; and if unsuccessful until so late a period, the reasons of the want of success should have been assigned. If courts can allow nearly seven years to elapse, after the appointment of an assignee, before he shall be required to take any steps to investigate alleged fraudulent transfers of property, or

to ascertain why the bankrupt retains the possession and control of the bulk of his estate, after adjudication and without any excuse being assigned for such delay, except the naked statement that he did not know of the fraud until two years before the suit was brought, I can see no reason why seven times seven years may not be allowed to pass, and still a suit be maintainable upon the simple allegation of the want of knowledge. It is neither the province or prerogative of courts to repeal legislation by any such methods of construction.

The demurrer must be sustained, and the bill dismissed with costs. If, however, the assignee did in fact use diligence and did institute inquiries which the sagacity of the bankrupt baffled for five years, and if the omission to make any statement of this character was accidental and can be truthfully supplied by amendment to the bill, and if the complainant desires the opinion of the circuit or supreme court upon the first question on the demurrer, I shall be glad to allow him to amend and to have the case put in such a position that the judgment of this court may be reviewed, and if needs be corrected.